May it please the Court. This Court should reverse and render judgment in favor of TDCJ, first because deference survives Holt v. Hobbs, and second because TDCJ's evidence satisfies the plausible explanation clause from Holt. Before I address the implications of Holt, I want to let the Court know that in light of Holt, TDCJ has changed its grooming policy, now permits a half-inch beard pursuant to a religious exemption. And in the first three months, we processed nearly 37,000 requests to grow a religious beard. That, however, does not move Mr. Ali's claim, because he testified he would not accept anything short of a fist-length or a four-inch beard. Did that change in policy affect our decision here? Should it be sent back to the trial court for re-evaluation given the new policy, or it does not affect anything and we should continue with this case as it is here before this Court? It should not be remanded, Your Honor, because Mr. Ali said that he wouldn't accept anything shorter, and so a half-inch is not going to change his claim. And the record here is fully developed as to why TDCJ cannot accommodate a four-inch beard or a koofy cap without some restriction. Initially, Holt does not overrule the deference mandated in Cutter v. Wilkinson. In Holt, the inmate sought a half-inch beard, and that case was dismissed after a short evidentiary hearing involving only two witnesses. The rule from Holt can be described as a two-part analysis. First, the prison system has to put in evidence of its, quote, plausible explanations for its chosen policies. Once the prison system puts on that evidence, then you move to step two, and step two is that deference is due. Now, in Holt, Arkansas did not put in that evidence, so the principal opinion only discusses that first prong. They never got to step the second prong. Well, but the Justice's legal opinion does say, makes it clear that we were not giving unquestioning deference to prison officials, and you can work with that word, unquestioning, no doubt for me. But nonetheless, it does address what you're talking about, and it seems to me whatever was held before about deference has been greatly altered by Holt. I would disagree, Your Honor. I don't think that Cutter mandated unquestioning deference, and Justice Sotomayor, in the concurring The clarification that we get from Holt is first you have to have that evidence, the plausible explanation and evidence to back it up, and I think that that was to correct maybe some circuits from offering unquestioning deference. In her concurring opinion, she echoed the phrase deference is due, and in this case, we're not asking for unquestioning deference. In fact, very, very little deference is required given the abundance of evidence in this record. Now, the reasons for our policies are that a four-inch beard and a koofy cap without restriction, they place contraband in our prison. They give another hiding place for inmates to hide contraband. There is no question from this record that contraband can and will be hidden in a four-inch beard. Now, however Mr. Ali phrased his proposed alternatives, he's asked the court to ignore the security concerns. There is no question it will be hidden in a four-inch beard? I'm sorry, Your Honor. Did you say there's no question contraband will be hidden in a four-inch beard? There's no question based on this record that it can be hidden in a four-inch beard. So there's evidence that it's happened in the past? Yes, Your Honor. TDCJ put in evidence examples of contraband hidden in beards and long hair, and that can be found in the exhibit starting at page 3478 and testimony at 6940 of the record. We also put in— So there are prisons that allow the four-inch beard? There are prisons that allow a four-inch beard. For example, the Federal Bureau of Prisons. California also—well, it's worth noting that California restricts beards to one inch. That's what their policy says. However, they gave up enforcing that policy. They found it unenforceable. They couldn't control the inmates to keep them within a one-inch beard. So there's evidence of terrible consequences as a result of these four— Well, there's evidence of examples of contraband being hidden. And also, TDCJ sent administrators to tour the BOP in California, and he went there specifically to study their grooming and koofy policies. And what he saw was that there were fundamental differences in the systems between TDCJ and those. He saw that they guarded their inmates with armed firearms inside the prisons, so inmates walk around with a gun barrel pointed at them, essentially. They also have a great number of metal detectors, lethal fences. They have—they're well-staffed. Their budget is triple, maybe quadruple that of TDCJ. All of this is in the record. In light of the new policy that now allows beards, does that water down some of the reasons, for example, identification or misidentification? Now that beards are allowed, does that water down that reason for not allowing beards? I mean, is security the main reason and concern for not allowing beards four inches long? Do you give up the other reasons, or are you still sticking to those other reasons in light of the new policy? No, Your Honor. The half-inch new policy does not undermine our security concerns and our time and cost concerns. A half-inch beard—and of course, the repercussions of that have yet to be seen—but a half-inch to search their own beards by running their fingers through it, that won't be effective for a four-inch beard. An inmate can easily undermine a self-search. And a four-inch beard won't allow an officer to visually see down to the skin. So that's one issue that's just—it's not the same with a half and a four-inch beard. Also with that long of a beard— Do you have to take a—well, I guess you don't know yet—with a half-inch, take a It looks like— Somebody's going to be checking the length. It looks like what we will be doing is just kind of eyeballing it. Send them to the barber if it just looks too long. As to the identification— Mr. Ali's barber—two lawyers, they'd pass the test, I guess. I believe they would, Your Honor. Now another issue is that with a four-inch beard, we're going to be very worried about putting our officers in the strike zone, standing in front of an inmate within reach to search a beard. Mr. Ali even testified that he would have a big problem, he would find it invasive and unfair if an officer tried to touch his face to search his beard. We also have testimony that offenders are going to resist these kinds of searches. Some of these arguments that you're making, were these—this evidence presented before the trial court? I guess what I'm getting at is there was a trial and the judge heard witnesses, expert witnesses from both sides and gave discretion to the Department of T.D., whatever, but still found that the witnesses for Mr. Ali were more credible and made a factual determination that this was not a—there was not a security concern, et cetera. So are we looking at overturning factual findings by the trial court? Is that what we're here about and isn't—don't we have to give the fact findings by the trial court a benefit of a doubt and accept them unless they're clearly erroneous? Your Honor, a RLUIPA analysis is a question of law, a mixed question. However, if you look at the 73 findings of fact in the district court's findings, we don't have a problem with the findings of fact. This isn't a case about contested facts. This is a case about what the facts in the record mean when you plug them into a RLUIPA analysis, so—which is why this court should conduct a de novo review and actually render judgment in favor of TDCJ based on a fully developed record. We're not looking to overturn findings of fact. If you look at the specific facts that any of the experts testified to, we're not necessarily contesting that. We're contesting what it means. Well, counsel, among the findings, and you may tell me it was a conclusion, but I thought I was listening about the findings, and it certainly was expressed as a finding, is that the magistrate judge accepted the evidence from the experts that beards are not a security problem. And he discussed why the evidence that you put on, your side put on, was not persuasive. It seems to me that we are back to what you started with, that some level of deference must be given. It's not so much to me whether it's a question of law or a question of fact. It's does the case that you create with some evidence, a whole lot more than was in Holt's, get more deference than the magistrate judge gave it? And that's certainly an important issue before us. But Holt, I think, is making it clear that under ARLUPA, or whatever my right pronunciation of that acronym is, that you do have to look beyond what the Departments of Corrections are saying around the country and determine what actually is the reality of the situation. So we need to question your evidence, it seems to me, and we can quibble over the wording, but I do think that's on the table. Yes, Your Honor. And the evidence in this record shows pictures of contraband. It details stories about contraband being hidden. And as to the experts, the judge did not weigh competing pieces of evidence from the experts. The judge weighed apples to oranges, and that's what Mr. Ali's experts testified about. Neither one of them knew what TDCJ's current security protocols were, how many inmates we have, how we move them around, what kind of security equipment we have. They didn't know what kind of budget we have, what kind of staffing issues. They testified that they did not know or consider any of that. Counsel, you said that the judge, the magistrate judge, weighed apples and oranges. Didn't the magistrate judge find the experts offered by Mr. Ali more credible than the government's experts? And I would assert that that . . . Isn't that the finding of the magistrate judge? He did use those words, that they were more credible. However, because an expert says it does not mean that it is a question of fact. The experts gave conclusory opinions that TDCJ can change its policies without security problems and without cost. There is no evidence in the record that supports that opinion. The opinions of Mr. Ali's experts were based on what they had seen in the Federal Bureau of Prisons. And because Holt says that we have to, we put in evidence as to why we are different from the Bureau of Prisons. Mr. Eason went to the Bureau of Prisons for the specific purpose of looking at their policies. He was there for two days and did not witness a single search of an inmate. That was so surprising to him because it's such a fundamental difference in how TDCJ runs its prisons. And perhaps the BOP can do that because of their additional staff or their additional security equipment. However, the systems were simply so different that Mr. Eason decided TDCJ doesn't have the resources, our system is just so different, we can't implement the same policies. Also, the BOP and California have accepted and permit a risk of contraband and identification problems. TDCJ is not bound under RLUIPA to accept the same risk profile. And by the examples and the stories of contraband hidden in beards and the identification problems throughout the prison, TDCJ has found that that is an unacceptable risk and assessed how we might combat that risk. So your TDCJ facilities, although you're underfunded and understaffed compared to BOP, your facilities are safer, though, because you don't accept these. You find certain risks unacceptable. So is that right? I think every— There's empirical data which would show that your facility is safer now than the BOP's facilities. I can't make that argument and the evidence doesn't show which facility is safer. However— Because I heard—because you're right. You said you understand. Is that right? That's true, Your Honor. And then you said you were underfunded. That's true. All right. Prison systems are in the business of weighing risks, and every prison has to accept a certain risk profile because no prison is 100% safe, 100% free of contraband. And prison systems must be permitted to combat the risk profile in the ways that the legislature and the prison administrators deemed appropriate in our state. TDCJ put in the hard numbers, the math, the statistics that were missing in Holt, and they were missing in Garner. We put in evidence of how long it would take to search beards and koofies. We were able to calculate that it would take 115 hours every single day to do nothing but search beards if only 25% of the population chose to grow a beard. And we now know that that may be an underestimate. But at only 25%, that's 115 hours per day. Now, even if RLUIPA requires TDCJ to expend some amount of money to accommodate religious beliefs, TDCJ paid $50 million in a single year in overtime expenditures. We have the money. We can't hire enough staff. Now, the reasoning for us being unable to fill our authorized staff positions, that's also in the record. We don't pay our officers quite as competitive as some other jobs. So, when we can't hire enough staff to do all the things that we need them to do in a prison, then we start canceling activities. We cancel activities like classes, like recreation. And that has terrible consequences in a prison unit. And that is something that is already done on occasion in TDCJ. And so, this isn't a system that's just going to absorb 115 hours every single day to do nothing but search beards. Counsel? Yes. Your red light is on. Thank you, Your Honor. Mr. Benefiel? Court? The judgment of the trial court is consistent with the teachings of Holt v. Hobbs, as well as this court's prior decisions in Garner v. Kennedy and McAllen Grace Brethren Church v. Salazar, and should therefore be affirmed. Contrary to TDCJ's assertions, the trial court's findings, which do include a finding that our expert witnesses were more credible than all of TDCJ's witnesses, did not violate the deference afforded to the trial court under our LUIPA strict scrutiny framework. Well, Counsel, what is your explanation, I'm sorry, Mr. Buzardo, what is your explanation on the existence and description of deference that applies after Holt? I think the deference that exists is kind of akin to a thumb on the scale. If it's a close call, then the deference goes to the state to nudge their evidence across the line. If there's a Tenth Circuit decision, it's the Yellow Bear case where they talk about deference in the strict scrutiny framework in our LUIPA case and say when the evidences are equal, it nudges the state across the line. Well, one of the reasons for deference in the past without religious freedoms being involved is this is outside the area of expertise for any of us judges, or most of us anyway. Security concerns that are very real in a prison setting may not be recognized by the judiciary. That's why there's evidence. I appreciate that you point on evidence, as did the state. But it is a path that Holt, through your briefing, you're saying is setting us down, sending us down, that would not give much deference to prison officials on the realities of their world. And that's troubling. And I'm just wondering if we need to be careful not to draw, to eliminate deference to too deal with both of those interests. And I think that deference should be afforded to prison guards, this case and then the prison officials. But they can't just give their say so. They can't declare their security concerns by fiat, is what the concurrence in Holt said. And that's what we have here, the trial court weighed evidence. We actually brought our own experts with combined 60 years working in prison systems that actually allow beards, full-length beards and koofies. One of our experts spent 20 years in the Federal Bureau of Prisons, and he said, beards and koofies just aren't a concern. We let all the guys have them. They let all inmates grow beards. They let all inmates grow out their hair. They let inmates wear caps and do rags and things of that nature. So those are not security concerns in the BOP. They can't be solved by simple pat searching. They don't cause identification concerns. And so this case, I think, is somewhat unique in the fact that the plaintiff was able to put on his own independent, his own experts to refute some of the assertions or many of the assertions that TDC's experts put forward. And so this isn't a case where the court had maybe very little to go on or only had the testimony of the state's experts and security guards to rely on. He actually had other viewpoints to consider. And he did consider those, and he made findings, including the express finding that our witnesses were more credible than TDCJ's witnesses, in part because they had much experience with beards and koofies in prison settings. You see that this is a little different from the whole case where it's at half an inch is okay. Four inches, then you can start maybe hiding stuff in beards. So at some point, deference to the present system that we have some security concerns here because half an inch, there's not a problem, but we start getting to a length where maybe they can hide some things, then maybe it starts becoming a problem. Is this different from Holt to that extent that here there should be some deference because of the length of the beard? No, sir. I respectfully suggest no. It's interesting. At trial, Director Eason, which was the TDC's main security expert, he said he went to visit the BOP in California facilities to determine if a quarter inch beard could be a least restrictive means. And he concluded that no, it can't. And the reason is because quarter inch beards, in his view, and also Warden Bailey's view, who testified, have the same security risks as fist-length beards. So TDC was equating the two beard lengths at trial. It's interesting that they've now changed their policy to allow half inch beards because it kind of undermines the credibility of their testimony at trial. But the only evidence that's in the record about security differences between quarter inch beards and fist-length beards is that it takes an extra two seconds to search a fist-length beard. So that's what we're talking about, two extra seconds to search. Counsel, what is the evidence in here about the religious significance of this length? I thought there was evidence that there's that significant view of the Muslim faith is a full-length beard. We've approved a half inch under Holt. I mean, it does seem to me that this case is just the next step down the beard road. Is there evidence of a significant Muslim belief in full-length beards? And if so, that case is right behind this one, I would imagine. We had a religious expert that testified on Mr. Ali's behalf, too, and he addressed this issue briefly. The Muslim community, there's an authority to have a beard that's at least a fist-length. Meaning the length that he wants, that Mr. Lee wants here. That's right. So I think as far as the Muslim community is concerned, I think that the fist length is the maximum beard length. I don't know. You're saying that's what the evidence in this case supports? Yes, sir. Okay. And so back to the contraband issues, one of the trial court's determinations was he looked at the other types, but basically the under-inclusiveness of TDCJ's policies at issue here. And he looked and said, well, what types of things are they willing to let inmates have? And compared that to what Mr. Ali was requesting, TDC lets inmates wear these big coats. There's pictures of it in the record with pockets and a hood. They let their inmates wear caps in the kitchen, which is indoors. They give them to their inmates to wear outside while they're working to give them sun protection. Inmates are allowed to wear boots. He also looked at the female inmates. The female inmates are allowed to grow their hair long down their back. So there's a lot of hair that has to be searched during female pass searches. TDC lets inmates change their hairstyles. Like for a male, he can grow his hair out, then he can shave his head. Females can cut their hair. TDC also lets its female inmates who are Muslim wear hijabs, which a hijab is a piece of fabric that's 41 inches by 41 inches. And they let them put their long hair up in a bun and put it on their head and wear those throughout TDCJ's facilities. That's this precise relief that Mr. Ali is requesting, except he's not going to wear a hijab. He's going to wear a little kufi, which is akin to a little skull cap that comes down just above your ears and foreheads and forms to your head. It's got elasticity to it. There's a picture of that in the record as well. So the trial court evaluated all these policies and said, really, I think came to the conclusion that what we're talking about here in terms of beards and kufis, that it's a type of things that TDCJ is willing to address in other contexts. I mean, it's a simple search. It may take a little bit more time to search the inmates that have beards, but that's all we're talking about here. In terms of identification, for the ladies that wear the hijab inside the prison, their ID photos don't even have a picture of the hijab in them. So TDC's own policies are kind of undermining the credibility of their arguments, or did so with the trial court. In terms of costs, in their brief, TDCJ suggests that 125,000 inmates, that's 90% of the male population, would request a fist-length beard. The trial court said that was just speculation because they didn't prove anything to support that in trial. But if we use that number and we use the search estimates that the trial court found, as he said, it takes three seconds to search a kufi and five seconds to search a beard, then we're talking, to search 125,000 inmates, it's $6.8 million a year. That's 0.2% of TDCJ's annual budget of $3.1 billion a year. Those searches would take 1,100 hours a day. That's out of 130,500 hours of CO time a day. At trial, TDC had employed over 20,000 COs. That equates to 130,000 of CO hours a day. So it would be 9.9%, less than 1% of a guard's daily activities would be searching beards if 125,000 inmates had those. If we go down to 40% of the male population, that would cost TDC $5 million a year, which is 0.1% of its annual budget. That would be 494 hours per day, which is 0.4% of daily CO hours. If 100% of the Muslims grew beards in the units, that's 6,400 inmates. That's a cost of $353,000 per year, which is 0.01% of TDC's annual budget. That would be 57 hours per day, which is 0.04% of daily CO hours. And if 40% of the Muslims decided to grow beards, that's 2,600 inmates. That's $141,000 a year in costs, which is 0.005% of the annual budget. Or 23 hours a day, which is 0.02% of the daily CO hours. And that's assuming that these searches of beards and koofies can't be absorbed into the normal activities of the guards, which the trial court actually said their TDC didn't put on any proof that it would have to hire more guards. And these types of searches are things that he thought would be subsumed within the current. Was there evidence that one of the things that your friend on the other side was saying is that searching these longer beards will require a closer physical presence, whether there's a greater risk to the guards? She quoted your client as saying he would find it, whatever the word was, offensive for somebody to be doing that to him. Are these searches you're talking about, the searches that are being undertaken now for what is allowed, putting the officer as close to the inmates as would be required for the beard search? Yes. I mean, they do pat searches now where they make them turn around and search them. And so they're in a strike zone. They can come back on the elbow and elbow the guards while they're getting pat searched. So a search from the back and now they'll have to be searched from the front? Is that a change? That's, yeah. It's just a quick search, shake out your beard. Even now they make them shake out their hair if their hair is long. So the guard will be there and they'll make them shake out their hair. And so the trial court considered this argument and rejected it. I guess I'm not quite following what you're saying. Are the searches being done now being done from behind the inmate where perhaps the ability of the inmate to assault would be less, but the beard search would have to be done from the front? It depends on the type of search, I guess is what I'm saying. Typically a pat search, my understanding is, is the officer is searching from behind. But I wouldn't say that he's not in a strike zone because the inmate can still elbow him. It's a different kind of strike zone. Yeah. But a beard search or a hair search, I think the inmate would be looking at the guard so the guard can actually do a physical inspection of the hair and have him shake out his hair. Those arguments were considered by the trial court. And, again, he found the BOP expert's testimony to be more credible that they don't have any trouble searching beards. I just wanted to address a few things. Ms. O'Leary said that there was evidence in the record that contraband can be hidden in a four-inch beard. That's not true. When Mr. Eason visited the BOP, they said they had very little contraband in hair. They did find some in some dreadlocks, but not in beards. California, no problems with contraband in hair or beards. And they had less problems once they relaxed their grooming policies to let inmates grow this length of beards. And thank you. Thank you. Ms. Anderson? What does the Department of Justice have to say? Yes. Well, first I'd like to address this issue of deference. I think that's one of the main concerns here. And the prison has described it as giving a plausible explanation of their policies, but I don't think that's what Holt requires. I do find that phrase in Sotomayor's concurrence, but I think using that phrase really isn't true to Holt. Holt said that this deference is respect for the prison official's expertise. It also said they have to not merely explain, but prove that they are using the least restrictive means. And they get this straight from Arlupa's language, which says that the prison has not just a burden of production, but a burden of persuasion. So basically they have to convince the judge not only that they have evidence, but that it's relevant, that it convinces the judge of the facts. If you look at the— Is our review perhaps heightened as a result of that? The state has put on evidence of serious concerns about the policy change. There are questions that are being raised about whether some of the experts didn't fully understand how Texas Department of Corrections operates, maybe didn't factor in all the maybe inmate guard ratios. I'm just wondering if we're going to give less deference to the prison officials, whether appellate courts need to be more searching, that the lower court properly, fully analyzed the evidence and gave even—gave more intention to the distinctions between what this background and experience was versus— Is there any basis for that, do you think, in what we're looking at? If we're changing the rules on the deference being given to prison officials, does it change in any way the role of the appellate court? Certainly, the appellate court needs to make sure that the deference was given, so I think there might be a slight change, but it doesn't change the underlying role, the fundamental role of a district court in making factual findings. And if you look at what the district court did here, I think you can see that deference was given. The court—of course, Holt didn't come down yet, so the court was actually operating without some of the guidance that Holt was given, but it quoted Cutter and it said, I have to give deference here, there are limits on deference, and then it followed what Cutter had said deference means, and that's to keep this in the context of a prison. Remember that this happened in prison. It analyzed these facts within the prison context and often within the context of Texas's own policies. If you take the example of Kufi's, the court looked at that and said, yes, I think I agree with the prison that this is someplace you could hide contraband. It looked at the fact that the prison allows hats in other contexts outside the prison when people are working outdoors in the kitchens, and there was evidence that when prisoners go outside, that's actually one of the most problematic times when they're picking up contraband. Nevertheless, the prison has found a way to deal with that, to search these hats and allow them in that context, and that's strong evidence that they can allow it in the religion context. I think this bears out another important principle that Holt said. Holt said you have to look at analogous conduct within the prison, and that's one way of keeping it in the prison context. Holt said that analogous conduct in that case included the fact that prisons regularly find contraband in hair, in shoes, in clothes, but as Holt said, the prison doesn't require the inmates to go around bald, barefoot, and naked. They have ways of dealing with this. In fact, in this case, the prison explained that it has found contraband in hair, and the evidence was that they would search beards the same way they searched hair. So they really didn't convince the judge and carry their burden of proof and their burden of persuasion in showing that a beard is so different from these other ways that contraband is smuggled in that they just can't allow it. There's no less restrictive means to restrict prisoners' right to wear a beard and a kufi in observance of his religion. Do you think that in light of the new policy that this matter should be remanded for the magistrate judge to look at it again with regard to the length of the beard at the time that he was making the decision, just a matter of whether there should be a beard or not? But now the state of Texas is saying half an inch is okay, so now the issue is length. Does that make a difference, or do we have enough here to make a decision, and did the magistrate judge adequately evaluate the issues without a need for remand? Well, the district court here is considering a 4-inch beard, and that's what the prisoner is asking for. So I don't think the differences between a 4-inch beard and what's allowed here are really relevant. If anything, I guess it might strengthen the argument. As prisoner's counsel has explained here, their plans for searching these beards are to have the prisoners run their hands through them and shake them out. That's the same thing they do for hair, and they sometimes find contraband in hair. They still allow hair, and it shows that their search methods really have been adapted for this. So I think that the change in the policy, if it changes anything at all, really benefits the district court's opinion. The district court's opinion is also in line with Holt's holding that it's important what happens in other prisons. Now, the district court in this case said this wasn't the main reason he was making this decision, although it was good evidence. But Holt actually said that once a prisoner presents evidence that things are done differently in other prisons, the prison has to offer a persuasive reason why their prison is not the same. In the Holt case, there were two prisons presented at trial court that had different practices, and Holt said the prison had not adequately distinguished itself. In this case, both parties went into a lot of evidence about the two prisons. They lined up all their similarities and differences, and the district court properly made findings of fact here, which are under clear error review, that the Bureau of Prisons actually has fewer guards per inmate than Texas does. And because guard time is the main concern with searching beards and searching coopies, that was the most important difference to consider. It was well within the district court's fact-finding purview to make that finding of fact, and I think it would be strange if this court were to find under clear error review that it can basically go back, question the district court's logic in which experts to believe, decide which facts were most relevant to the situation presented in this case, and to really undermine the traditional role of a judge as fact. Did the trial court give proper deference to the State in the trial with regard to their concerns and opinions? Did he follow Holt and give the proper deference to the State officials? Well, he actually followed Cutter because Holt hadn't come down yet. But yes, he said, I need to give you deference under Cutter, and he evaluated this carefully, line by line, addressing the prison's concerns, the administrative procedures that they already had, and their own ways of doing things within Texas prison and found that this could be done. Let me ask you, with my presiding judge's permission, to extend this a little further. Do you see any distinction from what would be allowed if we affirm this, and basically any length of beard at all? Is there a place at which a prison could limit the length of beards? I think so, Your Honor. Holt and this court's previous decision say this is a case-by-case analysis. Well, but the case-by-case, the case we're at right now, it's saying it may take more guards, it may take somewhat longer time to be inspecting the beards, another four inches, another eight inches, take maybe a little bit more time. It seems to me that the result of this case is very close to saying it would be very hard to limit the length of beards. Well, because the prison has the burden of proof, the prison would have to show this longer beard is unmanageable, this can't be accommodated, you know, given our practices. I guess the only thing I can say here, as representative of the federal government, is the Bureau of Prisons has allowed any length of beard. This rule has been in existence since the 70s, and our prison officials just don't find it to be a problem. There are problems in the prison, but they don't point to the beards as being the reason. The contraband comes in, contraband is found, beards are searched, clothes are searched, shoes are searched, and this one thing just isn't a problem. Thank you, Counsel. Thank you, Ms. O'Leary. Ms. Anderson, Ms. O'Leary, you're next. Thank you, Your Honor. Affirmance of this judgment will effectively eliminate any level of deference because the record is so significantly full of evidence showing TDCJ's security concerns. Ali and the Department of Justice are asking this court to raise the bar of due deference so high that the prison system in this circuit would no longer be able to meet it. In other words, the record in this case meets that evidentiary burden under RLUIPA, and deference is due. I want to address the winter jackets and the caps that TDCJ allows in its prison systems. Yes, our prison officials might agree that making offenders walk around naked would be more safe, but TDCJ is a humane and lawful agency, and the Constitution does not permit a prison system to weigh its security interests against cruel and unusual punishment. That balancing is not permitted. RLUIPA, however, is written to require that balancing for a prison system to weigh its security interests against a religious request for an accommodation and make a decision, as long as that decision shows that it's the least restrictive means of furthering its compelling interests. For head hair, TDCJ permits approximately a half inch or shorter. It has to be short, very neatly groomed. And to answer your question, Judge Southwick, about how searches are done, there's no search in TDCJ currently that requires an officer to stand in front of an inmate within arm's reach, and that would be required for a four-inch beard search. Is there evidence in this record that that's a more dangerous location for a guard? You don't have to point me to the record, but does it exist in your recollection? Yes, Director Eason testified about his concerns, and Warden Foxworth testified that that is a startling position for an officer to be put in. They're trained to stay away from that strike zone in front of an offender. I'd also like to address the female inmates evidence. A lot of evidence came in at trial about what we do for the female offenders. This circuit has recognized different treatment of male and female offenders, and the reason for that is that they present different security concerns. There's lots of testimony in this record about female offenders and the different security concerns. Yes, females bring in contraband, but they're not concerned with the sharpened metal bolt. They're not concerned with the drugs and the cell phone parts. The female offenders are concerned with a new shade of lipstick that we didn't sell in the commissary. And so they might have contraband too, but it's a different security concern. We've also never had a female offender escape in the history of TDCJ. And so in order to narrowly tailor our policies, we have different policies for men and women. You've never had a female want, you said, in the history of the? We've never had a female escape in the history of TDCJ. Now, as far as the experts that Mr. Ali presented, I discussed previously, Mr. Sullivan was his primary expert. He'd never been to study a TDCJ unit. He didn't consider any of our policies. And his only source, his main standard that he applied was majority rules. The BOP can do it, so can TDCJ. He testified that 41 other states allow beards and koofies. However, that's not what the evidence shows. Forty-one other states may permit beards, but many of them restrict beards to a shorter length. Ali's other expert, Mr. Gravitt, acknowledged a couple of states that he personally knew of that restricted beards to a half inch or a one inch. And so it cannot be said that TDCJ is not in the majority on that. Also with the koofies, TDCJ, like other states, permits koofies in our prison system. Offenders are allowed to have and wear koofies. We simply restrict them to in their cells, around their bunk areas, and at any religious service. And that is how we narrowly tailored our policies to try to eliminate the security concern with that. Now, TDCJ's concern with short beards was always that you can't enforce it, which is what California said they couldn't do. A quarter inch, a half inch, it leads to a longer beard. And so because some of the record evidence talks about quarter inch, that's because Mr. Ali had previously requested a quarter inch in this case, and right before trial he abandoned that. But TDCJ did not have a burden at trial to show why it couldn't accommodate a quarter inch or a half inch or anything shorter than a four inch. When Mr. Ali said, I won't accept anything shorter, then all that matters is why TDCJ can't accommodate a four inch beard. Mr. Ali can't have it both ways, put a harder burden on TDCJ to show a quarter inch is a problem, but he's requesting a four inch beard. And so the issue is narrowly tailored. Thank you, Your Honor. How many religions or how many people are requesting this? Is it just Muslim religion or are there numerous religions or inmates that are saying their religion requires a beard? There's record testimony and evidence that we, for example, Roman Catholics, Jewish offenders, Orthodox Jewish offenders, Rastafarians, Odinists, we put in pending lawsuits from various faith groups, and that's all in this record. Thank you. And those are all about beards. I'm sorry? Those are all about beards, these pending lawsuits. Yes, beards and wearing religious headwear. Thank you. Thank you all very much. And the court will take a short recess.